IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

TIMOTHY LEE RIPLEY,             )
                                    )    CASE NO.  3:18-CV-02976-JDG
              Plaintiff,        )
                                      )
     vs.                         )    MAGISTRATE JUDGE
                                    )    JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL     )
SECURITY,                    )
                                    )    **MEMORANDUM OPINION &**
              Defendant.     )    **ORDER**

Plaintiff, Timothy Ripley ("Plaintiff' or "Ripley"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In March 2016, Ripley filed an application for POD and DIB, alleging a disability onset date of April 3, 2013, and claiming he was disabled due to bipolar disorder, depression, and anxiety disorder. (Transcript ("Tr.") at 58, 154.)  The application was denied initially and upon reconsideration, and Ripley requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 12.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

On November 9, 2017, an ALJ held a hearing, during which Ripley, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On April 19, 2018, the ALJ issued a written decision finding Ripley was not disabled. (*Id.* at 12-22.) The ALJ' s decision became final on October 30, 2018, when the Appeals Council declined further review. (*Id.* at 1-6.)

On December 28, 2018, Ripley filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 14, 15.) Ripley asserts two assignments of error:

> (1) The ALJ's mental residual functional capacity evaluation is unsupported by substantial evidence as she failed to reconcile the opinion of Dr. Warren with the RFC determination.

> (2) The case was adjudicated by an improper and unconstitutionally appointed ALJ, and should be remanded for a new hearing with a different and constitutionally appointed ALJ.

(Doc. No. 12).

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Ripley was born in July 1957 and was 60 years old at the time of his administrative hearing (Tr. 12, 20), making him a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(e). He has a college education and is able to communicate in English. (Tr. 20, 60.) He has past relevant work as a retail store manager. (*Id.* at 20.)

### B.     Relevant Medical Evidence[2]

In 2012, Ripley spent three days at the Mt. Pleasant Hospital for a forehead laceration, alcohol abuse, and acute kidney injury. (*Id.* at 531, 597, 657.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

April and June 2013 therapy records reflect that Ripley was planning on moving to Ohio and was looking at businesses there, "including pizza places." (Tr. 488-89).

On August 4, 2013, Ripley's niece found him at home, and he was very confused and nonverbal. (*Id.* at 346, 376.) In the emergency room, Ripley remained nonverbal. (*Id.*) Robert L. Hill, M.D., who evaluated Ripley, noted Ripley has a history of depression and suicide attempts, and "there was concern that he gotten [sic] a prescription for baclofen recently and may have taken extra pills and overdosed." (*Id.*) Dr. Hill admitted Ripley for further evaluation and treatment. (*Id.*) While Ripley exhibited some twitching when he was first seen at the ER, "no definite seizure activity was noted." (*Id.*) A CT scan done that day revealed mild atrophy and chronic small vessel ischemic changes. (*Id.* at 376.) Ripley's urine screen was positive for opiates and benzodiazepines. (*Id.* at 350.) Eventually Ripley's mental status cleared, and he was discharged home three days later. (*Id.* at 346.) At the time of discharge, Ripley had no suicidal ideation and was instructed to follow-up with a local psychiatrist. (*Id.* at 347.)

On November 20, 2013, Ripley went to the Firelands Regional Medical Center emergency room complaining of depression and stating he had been unable to find a psychiatrist who could see him in a timely manner. (*Id.* at 343.) He felt he was "on the way back into depression" and his medications were running low. (*Id.*) Ripley denied suicidal or homicidal ideation. (*Id.*) Robert Ford, III, D.O., gave Ripley short refills for two of his medications but refused to refill his Xanax. (*Id.* at 344.)

On January 16, 2014, Ripley went to the emergency room at Firelands Regional Medical Center, reporting he had been having severe depression and suicidal intent for the past three to four weeks. (*Id.* at 335.) Ripley stated he had been going through a lot, including being unemployed and living with his brother. (*Id.*) He also reported he had run out of his medication, including Seroquel and Xanax, and became very depressed. (*Id.*) He described having feelings of hopelessness, worthlessness, and sadness,

anhedonia,[3] suicidal thought but no plan, being very anxious and nervous, and unable to sleep at night. (*Id.*) Ripley stated he could not afford to buy his current medications, which were very expensive, because of his financial difficulties. (*Id.*) Abas Jama, M.D., Psy.D., admitted Ripley and placed him on suicide precaution level one. (*Id.* at 338.)

An examination on January 17, 2014, revealed Ripley had average eye contact, clear speech, and a logical thought process. (*Id.* at 339, 341.) Ripley appeared very comfortable during the interview, he was cooperative, and his insight and memory seemed good. (*Id.* at 341.) Ripley denied suicidal and homicidal ideation, as well as hallucinations and delusions. (*Id.*) Ripley remained in the hospital until January 24, 2014. (*Id.* at 331.)

On June 23, 2015, Ripley saw Dr. Jama for a follow up appointment. (*Id.* at 391.) He reported he was doing a little bit better and was still working as a driver at a car dealership. (*Id.*) Ripley described his mood as better and less anxious, but somewhat sad. (*Id.*) Dr. Jama found Ripley had a full and appropriate range of affect and "very good" insight and judgment. (*Id.*) Ripley exhibited a goal-directed thought process and denied suicidal and homicidal ideation, as well as auditory and visual hallucinations. (*Id.*) Dr. Jama recommended Ripley continue his current medications, go back to AA meetings and counseling, never mix alcohol and Xanax, and follow up in three to four months. (*Id.*)

On July 10, 2015, Ripley went to the Firelands Regional Medical Center emergency room, reporting suicidal ideation without any plan. (*Id.* at 307.) He stated he had been drinking daily for the past 30 days and drinking around the clock for the past seven days. (*Id.*) He reported sleeping for two hours in the past fourteen days. (*Id.*) Upon examination, Mark Schmiedl, M.D., found Ripley was intoxicated. (*Id.* at 309.)

---

[3] "[T]otal loss of feeling of pleasure in acts that normally give pleasure." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 90 (30th Ed. 2003).

Dr. Jama also examined Ripley that day. (*Id.* at 313.) Dr. Jama found Ripley was cooperative and appropriate, he had mild to moderate psychomotor retardation, and had a depressed, anxious mood. (*Id.* at 314.) Ripley exhibited a blunted affect, and his speech was low in tone and volume. (*Id.*) While Ripley's thought process was goal directed, he had current suicidal ideation that was becoming very persistent and worsening, although he divulged no plan or intent. (*Id.*) Dr. Jama found Ripley's insight and judgment were impaired. (*Id.*) Dr. Jama admitted Ripley and placed him on level one suicide watch. (*Id.* at 309, 315.) Upon further examination, Ripley's treating providers found he was moderately depressed, somewhat tearful, and moderately anxious, and his insight, judgment, and behavior control were decreased. (*Id.* at 318.) Ripley also complained of periodic auditory hallucinations. (*Id.*)

On July 12, 2015, Sara Peck, LISW, MSW, examined Ripley at the hospital. (*Id.* at 320.) She found his appearance disheveled, his mood depressed, his affect normal, his behavior cooperative, his thoughts racing, his insight limited, and his memory intact. (*Id.* at 322.) Ripley reported suicidal ideation but no plan. (*Id.*)

On August 4, 2015, after being discharged from the hospital, Ripley saw Dr. Jama for a follow up appointment. (*Id.* at 397.) Ripley reported he was doing much better and described his mood as much better overall and stable. (*Id.*) Ripley denied feelings of hopelessness or worthlessness, as well as suicidal ideation. (*Id.*) Dr. Jama found Ripley had appropriate affect, goal-directed thought process, intact recent and remote memory, and intact concentration and focusing. (*Id.*) Dr. Jama noted a well-groomed and appropriate appearance and no abnormal or involuntary movements. (*Id.*)

On September 4, 2015, Ripley saw Lynne Gilbert, LISW, for a follow up appointment. (*Id.* at 401.) He told her his depression was better, although he continued to have issues with his anxiety, and he thought he "may be ready for a job." (*Id.*) Ripley reported he had been socializing with new friends and was worried about the stock market. (*Id.*) Gilbert found Ripley had a full, anxious affect and his behavior

was appropriate.  (*Id.*)

On September 28, 2015, Ripley again saw Gilbert for follow up.  (*Id.* at 404.)  He told her he was not depressed, but he would wake up anxious and not know why.  (*Id.*)  He reported being uncomfortable in crowds and grocery stores.  (*Id.*)  He continued to work part time for a car dealership and had some friends with whom he socialized.  (*Id.*)  Ripley felt his medications were working well and he was waiting for vocational rehab.  (*Id.*)

On October 20, 2015, Ripley saw Dr. Jama and reported he was a little bit anxious but coping very well and described his mood as "better and improved."  (*Id.* at 406.)  He stated he had visited his daughter in California, and it had gone well.  (*Id.*)  Ripley told Dr. Jama that he could not afford Abilify and asked for a different medication that was less expensive.  (*Id.*)  Dr. Jama found Ripley exhibited appropriate affect and a goal-directed thought process.  (*Id.*)  Ripley denied suicidal or homicidal ideation, as well as auditory or visual hallucinations.  (*Id.*)  Dr. Jama adjusted Ripley's medication and encouraged him to stay sober.  (*Id.*)

On November 17, 2015, Ripley saw John McDonough, R.N., to discuss Seroquel refills and for an assessment for medication compliance, side effects, and bipolar disorder symptoms.  (*Id.* at 416.)  Ripley reported Seroquel was working and he had no side effects, but he would be out of the medication before his next appointment with Dr. Jama in January.  (*Id.*)  Ripley told Nurse McDonough his mood had been stable, he had been getting adequate rest, and his appetite was good.  (*Id.*)  Nurse McDonough found Ripley's speech coherent, his thought process intact, and his behavior cooperative and pleasant.  (*Id.*)  Ripley exhibited a bright and full range of affect.  (*Id.*)

On December 17, 2015, Ripley went to the Firelands Regional Medical Center emergency room complaining that he was going through alcohol withdrawal.  (*Id.* at 299.)  He reported that he quit drinking the previous night but had drank eight to nine beers a day for the past month.  (*Id.*)  Ripley stated over the

past eight hours he had become very jittery, shaky, and nervous. (*Id.*) He felt very depressed and hopeless. (*Id.*) He had thoughts of suicide but no real plan, and just wanted to quit drinking. (*Id.*) Timothy Amidon, D.O., found Ripley had a flat affect. (*Id.*) The hospital's mental health services evaluated Ripley and determined it was safe to send Ripley home. (*Id.* at 300.)

On January 4, 2016, Ripley saw Lynne Gilbert, LISW. (*Id.* at 422.) Ripley told Gilbert he had not been doing well, and he had had three bad days with increased insomnia, negative thinking, and suicidal thoughts. (*Id.*) Ripley said he had considered going to the hospital but declined voluntary hospitalization at this visit. (*Id.*) His symptoms included insomnia, negative thinking, increased anxiety, panic attacks, poor hygiene, poor appetite, and poor motivation. (*Id.*) Ripley reported he had visited his daughter over the holiday season the prior month and enjoyed himself, but that he did not do well this time of year. (*Id.*) Gilbert found Ripley's affect anxious and depressed and his behavior appropriate. (*Id.*)

On January 19, 2016, Anupam Jha, M.D., at Firelands Regional Medical Center admitted Ripley with active suicidal intent. (*Id.* at 282.) Ripley reported increased anxiety and racing thoughts, and he had barely gotten any sleep over the prior two weeks. (*Id.* at 284.) Ripley stated he had been feeling low and down, and his mood was sad and hopeless. (*Id.*) Upon examination, Dr. Jha found Ripley's attention and concentration restricted, his mood sad, his affect blunt, his insight and judgment poor, and his impulse control fair. (*Id.* at 285.) Active suicidal ideation was present. (*Id.*) Dr. Jha placed Ripley on level one suicide watch and started him on Trileptal, Buspirone, and Zoloft. (*Id.* at 286.)

On January 20, 2016, Laura Conley, MSW, LSW, examined Ripley while he was in the hospital. (*Id.* at 287-89.) Conley found Ripley's mood anxious but appropriate, his affect normal, his behavior cooperative, his thought process concrete and logical, his insight good, and his memory intact. (*Id.* at 289.) Ripley exhibited average eye contact and denied suicidal and homicidal ideation, as well as hallucinations. (*Id.*)

On January 25, 2016, Dr. Jha discharged Ripley from Firelands. (*Id.* at 282.) Dr. Jha noted Ripley responded well to treatment measures as well as individual and group therapy, he had gotten along well with peers and staff, and he had not complained of medication side effects. (*Id.*) Upon examination, Dr. Jha found Ripley alert and oriented, and he had attention and concentration within normal limits, a relaxed affect, and good insight, judgment, and impulse control. (*Id.*) Ripley was in a good mood and exhibited a linear, future-oriented thought process. (*Id.*) Ripley denied suicidal and homicidal ideation, as well as auditory or visual hallucinations. (*Id.*)

On February 9, 2016, Ripley saw Dianna Gonzales, R.N., for not having enough medication before being seen by Dr. Jama. (*Id.* at 446.) Ripley requested being put back on Xanax, and Nurse Gonzalez encouraged him to discuss his concerns with Dr. Jama. (*Id.*) Ripley denied anxiety, paranoia, hallucinations, and suicidal and homicidal ideation. (*Id.*) Nurse Gonzalez found Ripley well-groomed, alert, and oriented. (*Id.*) While Ripley exhibited a blunted affect, he made good eye contact and answered questions appropriately. (*Id.*)

On March 8, 2016, Ripley again saw Nurse Gonzales for medication refills and rescheduling his appointment with Dr. Jama. (*Id.* at 451.) Nurse Gonzalez noted Ripley was "irritable" during medication education, even though he admitted forgetting the doses, times, and names of his medications. (*Id.*) Nurse Gonzalez found Ripley's affect irritable at times but otherwise congruent. (*Id.*) He appeared well-groomed, made good eye contact, and answered questions appropriately. (*Id.*)

On March 29, 2016, Ripley saw Lynne Gilbert, LISW, and reported his anxiety was worse. (*Id.* at 454.) Dr. Jama had reduced his Xanax, which frustrated Ripley as he felt Xanax helped him. (*Id.*) Ripley was still working part time and was anxious because he was looking into buying a condominium. (*Id.*) Gilbert found Ripley's affect anxious and his behavior appropriate. (*Id.*)

On April 29, 2016, Ripley went to the Firelands Regional Medical Center emergency room complaining of anxiety triggered by financial problems. (*Id.* at 463.) He reported being unable to think clearly because of his anxiety. (*Id.* at 468.) Ripley had attempted to get ahold of his psychiatrist with no success. (*Id.* at 463.) He denied suicidal or homicidal ideation but felt like he was "going to snap" and needed "something to get some relief." (*Id.*) On examination. Amir Shahideh, M.D., found Ripley slightly anxious, not internally stimulated, cooperative, and "mentating appropriately." (*Id.* at 465, 469.)

On May 2, 2016, Ripley saw LISW Gilbert and reported that he had been anxious because was trying to finance a condominium and was uncertain the deal would go through. (*Id.* at 476.) Ripley also stated Xanax was the only the thing that helped his anxiety and was concerned because it had been reduced. (*Id.*) Gilbert encouraged Ripley to socialize more and pursue part time work. (*Id.*) Gilbert found Ripley's affect anxious and his behavior appropriate. (*Id.*)

On August 9, 2016, Ripley went to the Firelands Regional Medical Center emergency room complaining of dizziness and elevated blood pressures. (*Id.* at 528.) Upon examination, Dr. Shahideh found Ripley in no acute distress, with appropriate mentation and "no significant physical findings whatsoever." (*Id.*)

## C.     State Agency Reports

On April 27, 2016, state agency consultant Vicki Warren, Ph.D., completed a review of Ripley's medical records. (*Id.* at 62-66.) Dr. Warren opined that Ripley was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 64-65.) Dr. Warren opined that Ripley's abilities to perform activities within a schedule, maintain regular attendance, be punctual within

customary tolerances, and sustain an ordinary routine without special supervision were not significantly limited. (*Id.*)

With respect to Ripley's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, he would be able to carry out very short and simple instructions, but symptoms would limit his ability to sustain and carry out detailed instructions. (*Id.* at 65.) He could maintain attention, make simple decisions, and adequately adhere to a schedule in a setting without high production quotas/requirement to work rapidly. (*Id.*)

Dr. Warren opined Ripley would be moderately limited in interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) Ripley could interact with familiar groups of people but his symptoms place restrictions upon his ability to interact with others in a work setting. (*Id.*) Dr. Warren opined Ripley's symptoms limit him from responding appropriately to criticism from supervisors, but he could relate adequately on a superficial basis in an environment that entails infrequent public contact and requires little over the shoulder supervision. (*Id.*)

Dr. Warren further opined Ripley's depression and anxiety symptoms interfere with his ability to adapt to frequent and or rapid changes in expectations, but he could adapt to a setting in which duties are routine and predictable. (*Id.* at 66.)

On June 25, 2016, Juliette Savitscus, Ph.D., gave substantially the same opinion on reconsideration. (*Id.* at 74-78.) Dr. Savitscus found Ripley's ability to carry out very short, simple instructions meant he could perform one to three step instructions. (*Id.* at 77.) She also omitted the finding that Ripley's symptoms limited him from responding appropriately to criticism from supervisors

but retained the determination that he could "relate adequately on a superficial basis in an environment that entails infrequent public contact and requires little over the shoulder supervision." (*Id.*)

**D.      Hearing Testimony**

During the November 9, 2017 hearing, Ripley testified to the following:

- He lives alone in a one-story condo that he rents. (Tr. 32.)

- He works part-time for his brother, who runs a Ford dealership. (*Id.*) He ferries cars because he does not have to "really deal with anybody." (*Id.*) His brother will have a car ready for him; he drives the car from his brother's dealership to a different dealership, picks up a different car, and drives the second car back to his brother's dealership. (*Id.*) The number of hours a week he works varies – sometimes he does not work at all, sometimes he may work two or three days in a week. (*Id.* at 34.) He only works when they need him. (*Id.*) He thinks he would not have the job if his brother did not run the dealership. (*Id.*)

- He has a valid driver's license and no driving limitations. (*Id.* at 32-33.)

- He holds a college degree in business administration. (*Id.*at 33.)

- He has struggled with mental health problems since he was 21 years old and has had "several bouts of serious depression." (*Id.* at 34.) But in 2013, he "basically went nuts and took too many pills and ended up in the hospital." (*Id.*) Since then, he has been hospitalized for depression and anxiety in "three or four" of the past five years. (*Id.*)

- The way he feels prevents him from working. (*Id.* at 37.) He lacks motivation, his concentration is very poor, his short-term memory has been a problem lately, and even taking a bath and grooming is a chore. (*Id.* at 37-38.) He gets anxiety attacks, sometimes two to three a week, where his heart races. (*Id.* at 38.) He tends to shy away from crowds and goes to the grocery store very early so he does not have to deal with many people. (*Id.* at 37-38.) He cannot concentrate long enough to watch a TV show all the way through or read a book. (*Id.* at 41.) He can barely read a newspaper, and he can only finish things he absolutely wants to read. (*Id.*)

- His mental health symptoms cause extreme lack of sleep, lack of appetite, and lack of motivation for personal hygiene. (*Id.* at 40.) He has lost 50 pounds over the past two years. (*Id.*) His energy is low. (*Id.* at 44.) When he gets "extremely sick," he snaps at people and isolates himself. (*Id.* at 45.) He does not want to be around anybody. (*Id.*) He has crying episodes three to four times a month. (*Id.* at 46.)

- He receives mental health treatment approximately three times a month. (*Id.* at 45.) He sees two different counselors and a psychiatrist. (*Id.*)

- He sees his brother a few times a week, and sees his daughter, who lives in California, once a year. (*Id.* at 42.)

- A typical day for him consists of waking up, making coffee, watching the news on TV, checking Facebook on his phone, and then "tak[ing] the day as it rolls." (*Id.*) He loads the dishwasher and does laundry. (*Id.*) He is not able to clean his condo and it is "filthy." (*Id.* at 45.) He lacks the motivation to clean it and he does not care what it looks like. (*Id.* at 45-46.)

- He felt he could not be somewhere at a certain time and stay for a certain time, which would prevent him from working a job like sorting nuts and bolts for eight hours a day. (*Id.* at 43-44.) He also stated he was "not s stupid guy" and did not know if that job was something he could continue to do "in the best state of mind." (*Id.*)

The VE testified Ripley had past work as a retail manager. (*Id.* at 50.) The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age, education, relevant vocational background. These are non-exertional limitations only. He is limited to performing more -- and this is different than what I often use -- he is limited to performing more than simple tasks, but less than complex tasks. He can respond appropriately to occasional interaction with supervisors, coworkers, and the general public. He is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in stable, predictable work setting. Any necessary changes need to occur infrequently and be adequately and easily explained. He is to do no tandem work. Can the hypothetical individual perform the past job?

(*Id.* at 51.)

The VE testified the hypothetical individual would not be able to perform Ripley's past work as a retail manager. (*Id.*) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as: packer, stock handler or store laborer, and janitor (all medium exertion with an SVP of 2); sorter, inspector, and assembler (all light exertion with an SVP of 2); and inspector, sedentary assembler, and sedentary surveillance system monitor (all sedentary exertion with an SVP of 2). (*Id.* at 52-54.)

A person needing to lie down during the workday or have no contact with supervisors or coworkers would be work preclusive. (*Id.* at 55.) A person missing two or more days of work on a

regular, ongoing basis would be work preclusive. (*Id.*) Many employers do not allow any absences during the 90-day probationary period. (*Id.*) A person would need to be on task 85% of the time in an eight-hour period for competitive work. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 404.1520(d).

Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Ripley was insured on his alleged disability onset date, April 3, 2013, and remained insured through June 30, 2018, his date last insured ("DLI.") (Tr. 12.) Therefore, in order to be entitled to POD and DIB, Ripley must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2018.

2. The claimant has not engaged in substantial gainful activity since April 3, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder, a depressive disorder, anxiety disorder, and alcohol and substance abuse disorders (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to performing more than simple tasks, but less than complex tasks; He can respond appropriately to occasional interaction with supervisors, coworkers, and the general public. He is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable,

predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained. He is limited to no tandem work.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on July **, 1957 and was 55 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-21.)

## IV.   STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the

Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## V.     ANALYSIS

### A.     First Assignment of Error: RFC Challenge

Ripley argues the RFC lacks substantial evidence, as despite giving the opinions of the state agency reviewing psychologists great weight, the ALJ failed to include key limitations in the RFC, namely: performing very short and simple instructions; interacting with supervisors; and completing a normal workday or workweek without interruptions from psychologically based symptoms.  (Doc. No. 12 at 9-10.)

The Commissioner responds by asserting substantial evidence supports the RFC, and that there is "no requirement that the ALJ, by giving great weight to such opinions, adopt the opinions verbatim." (Doc. No. 14 at 8, 11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.   *See* 20 C.F.R. § 404.1545(a).   A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.   *See* 20 C.F.R.§ 404.1527(d)(2).[4]   An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

---

[4] This regulation has been superseded for claims filed on or after March 27, 2017.  As Ripley's application was filed in March 2016, this Court applies the rules and regulations in effect at that time.

The ALJ is obligated to consider the record as a whole. *Hurst v. Secy'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). "'[W]here the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.'" *Davidson v. Comm'r of Soc. Sec.*, No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (quoting *Moscorelli v. Colvin*, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016)) (citing SSR 96-8p, 1996 WL 374184, at *7); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-cv-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so.") (citations omitted), *report and recommendation adopted by* 2019 WL 95496 (S.D. Ohio Jan. 3, 2019). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her*, 203 F.3d at 391.

An ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D.

Ohio Nov. 26, 2014). This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion. *Snyder*, 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

The ALJ's analysis included the following discussion of the state agency reviewing psychologists' opinions:

> State agency examiners evaluated the claimant both initially and on reconsideration (1A, 3A). The claimant was found to have no severe physical impairments. Mentally the claimant was found to have mild restrictions in his ability to perform activities of daily living and moderate restrictions in social functioning and in concentration, persistence and pace. *The claimant was found capable of carrying out very short and simple instructions in a setting without high production quotas or rapid work. He was further limited to interactions with a familiar group of people on a superficial basis in an environment that entails infrequent public contact and requiring little over-the-shoulder supervision as well as only routine and predictable duties (1A). These findings were affirmed on reconsideration (3A). The undersigned assign* [sic] *these opinions great weight.* While these doctors did not examine the claimant, they had the benefit of the bulk of the hearing level record given the claimant's gap in treatment. These findings are supported by multiple physical exams, his sporadic and intermittent pattern of treatment, and his ability to work part time at the car dealership. Further these doctors provided a detailed narrative with citations to the objective record as well as consideration of the claimant's subjective complaints as well. Finally, these doctors have knowledge of Agency standards and definitions- adding elements of reliability and consistency [sic] their findings.

(Tr. at 19-20.)

Despite so finding, the ALJ determined Ripley possessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to performing more than simple tasks, but less than complex tasks; He can respond appropriately to occasional interaction with supervisors, coworkers, and the general public. He is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained. He is limited to no tandem work.

(*Id.* at 16.) Absent are the restrictions to "very short and simple instructions," no high production quotas or fast-paced work,[5] and "little over-the-shoulder supervision"[6] that the ALJ specifically credited in her analysis. (*Id.* at 19.)

While the Commissioner is correct that there is no requirement that the ALJ adopt the opinions "verbatim" by giving them great weight, the ALJ was still required to explain why the opinions were not adopted as the RFC conflicted with them. SSR 96–8p at *7. Further, the ALJ must always build an "accurate and logical bridge" from the evidence to her conclusions. Here, the ALJ failed to include the three limitations above in the RFC or explain why she did not incorporate those limitations into the RFC. (Tr. at 16-20.) This "failure is all the more glaring given that the ALJ afforded 'great weight'" to the state agency reviewing psychologists' entire opinions. *Davidson*, 2018 WL 1453472, at *2. Moreover, the ALJ explicitly mentioned the three limitations opined by the state agency psychologists, found their opinions were well-supported and consistent with the record, recognized their knowledge of agency standards and definitions – and then failed to include these limitations in the RFC or explain why she was not including them in the RFC.

"In these circumstances, the ALJ's failure to explain [her] decision deprived this court of a 'logical bridge between the evidence on the record and [her] conclusion," *Flesicher v. Astrue*, 774 F. Supp. 2d

---

[5] According to Dr. Warren and affirmed by Dr. Savitscus, Ripley could "maintain attention, make simple decisions, and adequately adhere to a schedule in a setting without high production quotas/requirement to work rapidly." (Tr. 65, 77.) These limitations pertained to their findings that Ripley was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*)

[6] It is not clear to the Court that "occasional interaction with supervisors" as set forth in the RFC is the same as "little over-the-shoulder supervision" as opined by the state agency reviewing psychologists. Even the Commissioner does not so argue; rather, he asserts, "[T]he ALJ made clear that the interaction with a supervisor was to be 'occasional' with few, infrequent changes in the work setting, with adequately and easily explained work that was routine and static, and performed in a stable, predictable work setting . . . These additional limitations reflect a setting where over the shoulder supervision would not be at issue." (Doc. No. 14 at 10.) But it is for the ALJ, not the Commissioner, to build a bridge between the evidence and the ALJ's conclusions.

875, 877 (N.D. Ohio 2011), and left the Commissioner, in [his] brief on the merits . . . , to defend the ALJ's decision with impermissible, post-hoc rationalizations, *see S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)." *Davidson*, 2018 WL 1453472, at *2. Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" the state agency reviewing psychologists' opinions, the Commissioner's decision must be vacated and remanded for further proceedings. *Id.* at *2 (quoting *Davis v. Comm'r of Soc. Sec.*, No. 1:16 CV 2446, 2018 WL 137779, at *10 (N.D. Ohio 2018); *see also Cooper*, 2018 WL 6287996, at *5.

**B.     Second Assignment of Error: Appointments Clause Challenge**

Ripley asserts, in light of the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), that the ALJ who conducted his hearing was not properly appointed under the Constitution's Appointments Clause at the time of his hearing and therefore did not have legal authority to preside over his case. (Doc. No. 12 at 14-15.) Ripley maintains SSA "acknowledged their ALJs as inferior officers that were not constitutionally appointed when, on July 16, 2018, then Acting Commissioner Nancy Berryhill approved all appointments as her own." (*Id.* at 15) (citing SSA Emergency Message EM-18003 REV 2, available at https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM).[7] He argues that to the extent the Commissioner relies on the Supreme Court's decision in *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952), that case is distinguishable, and further, case law outside this circuit (namely, the Middle District of Pennsylvania and the Eastern District of North Carolina) stand for the proposition that his Appointments Clause challenge is timely. (Doc. No. 12 at 15-16.) Finally, Ripley asserts that since his request for Appellate Council review was filed on June 15, 2018, one month before the Supreme Court's decision in *Lucia*, and his request was denied on October 30, 2018, three months

---

[7] Contrary to Ripley's assertion, as the Commissioner points out in his brief (Doc. No 14 at 13-14 n.3), the Acting Commissioner "ratified the appointments of [SSA] ALJs and approved those appointments as her own" in 2018 "[t]o address any Appointments Clause questions involving Social Security claims." SSR 19-1p, 2019 WL 1324866, at *2.

after *Lucia*, this is the "first opportunity [he] had to legitimately challenge the appointment of the ALJ" and so it is timely raised. (*Id.* at 17.)

The Commissioner responds that Ripley's Appointments Clause challenge is untimely, citing *L.A. Tucker Truck Lines, Inc.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012), and *Lucia*. (Doc. No. 14 at 13.) The Commissioner asserts, "in the wake of Lucia, 34 out of 35 district courts that have decided the issue have rejected attacks on the validity of an SSA ALJ's appointment where the claimant failed to make the constitutional challenge at the administrative level (although there is a split in two of the districts –the Eastern District of North Carolina and Eastern District of Pennsylvania)." (*Id.* at 19) (collecting cases).

"District courts in this circuit have uniformly followed" the trend that a Social Security claimant waives an Appointments Clause challenge by failing to raise it at the administrative level. *Berry v. Saul*, No. 1:18-cv-00046, 2019 WL 4923979, at *13 (M.D. Tenn. Aug. 20, 2019) (collecting cases); *see also, e.g., Williams v. Comm'r of Soc. Sec.*, No. 3:18-cv-1706, 2019 WL 5781771 (N.D. Ohio Nov. 6, 2019); *Harris v. Comm'r of Soc. Sec.*, No. 1:18-cv-01984, 2019 WL 4991641 (N.D. Ohio Oct. 8, 2019); *Fisher v. Comm'r of Soc. Sec.*, --- F. Supp. 3d ---, 2019 WL 4233463 (N.D. Ohio Sept. 6, 2019). Ripley "does not even acknowledge the prevailing case law in this circuit, and, instead," cites cases from the Middle District of Pennsylvania and the Eastern District of North Carolina that hold the minority view on these issues. *Berry*, 2019 WL 4923979, at *14. Nor does Ripley acknowledge the decisions from this district which rejected the reasoning in *Bizarre v. Berryhill*, No. 1:18-CV-48, 2019 WL 1014194, (M.D. Pa. Mar. 4, 2019). *See, e.g., Williams*, 2019 WL 5781771; *Fisher*, --- F. Supp. 3d ---, 2019 WL 4233463; *Gilbert v. Comm'r of Soc. Sec.*, 391 F. Supp. 3d 745, 748 (N.D. Ohio 2019); *Cummins v. Comm'r of Soc. Sec.*, No. 3:18CV1892, 2019 WL 2465300 (N.D. Ohio Mar. 18, 2019), *report and recommendation*.

Regarding Ripley's claim that this is the "first opportunity [he] has had to legitimately challenge" the ALJ's appointment (Doc. No. 12 at 17), a circuit split on the constitutionality of the appointment of

ALJs occurred well before the ALJ considered Ripley's application for benefits. *Axley v. Comm'r of Soc. Sec.*, No. 1:18-cv-1106-STA-cgc, 2019 WL 489998, at *2 n.1 (W.D. Tenn. Feb. 7, 2019) ("By the time Plaintiff received his final agency decision on March 24, 2017, there was already a split of authority on the issue of whether SEC ALJs were constitutionally appointed. *Compare Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016) (finding the appointments unconstitutional), *with Lucia v. SEC*, 832 F.3d 277 (D.C. Circ. 2016) (rejecting the argument that appointments were unconstitutional)."). In addition, "a regulation in effect long prior to the events in question states that claimants may receive an expedited appeals process to challenge a 'provision in the law that [the claimant] believe[s] is unconstitutional.'" *Page v. Comm'r*, 344 F. Supp. 3d 902, 905 (E.D. Mich. 2018) (citing 20 C.F.R. § 404.924(d)).

The Sixth Circuit's discussion about *Lucia* arguments in a case where the plaintiff failed to raise an Appointments Clause challenge in its opening brief before the Court of Appeals is illuminating with respect to the timing of Ripley's Appointments Clause challenge:

> Island Creek also cannot hold the line on the ground that its Appointments Clause challenge lacked merit until the Supreme Court decided [*Lucia*, 138 S. Ct. 2044]. No precedent prevented the company from bringing the constitutional claim before then. *Lucia* itself noted that existing case law "says everything necessary to decide this case." *Id.* at 2053. The Tenth Circuit, before *Lucia*, held that administrative law judges were inferior officers. *Bandimere v. SEC*, 844 F.3d 1168, 1188 (10th Cir. 2016). And many other litigants pressed the issue before *Lucia. See, e.g., Tilton v. SEC*, 824 F.3d 276, 281 (2d Cir. 2016); *Bennett v. SEC*, 844 F.3d 174, 177–78 (4th Cir. 2016); *Burgess v. FDIC*, 871 F.3d 297, 299 (5th Cir. 2017); *Jones Bros.*, 898 F.3d at 672. That the Supreme Court once denied certiorari in a similar Appointments Clause case adds nothing because such decisions carry no precedential value. *See Teague v. Lane*, 489 U.S. 288, 296, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). All in all, Island Creek forfeited this Appointments Clause challenge, and we see no reasoned basis for forgiving the forfeiture.

*Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 257 (6th Cir. 2018).

"The Court has considered [Ripley's] arguments, which are similar to arguments previously considered and rejected by this and other courts." *Harris*, 2019 WL 4991641, at *12 (citation omitted).

The Court finds Ripley failed to raise timely his Appointments Clause challenge, and such failure is not excused. *Id.*

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**


Date:  December 4, 2019                         *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge